IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SOLOMON KEALOHA, *a.k.a.*,<br>SOLOMON MARTIN,<br><br>Defendant. | Case Nos. CR 17-00555 DKW/<br>CR 04-00265 DKW<br><br>**ORDER DENYING**<br>**DEFENDANT'S MOTION FOR A**<br>**SENTENCE REDUCTION** |

Pursuant to 18 U.S.C. § 3582(c)(1), inmate Solomon Kealoha, proceeding *pro se*, filed a motion for a sentence reduction,[1] arguing that the "COVID-19 pandemic" and his "pre-existing health problems" justify reducing his 126-month sentence or placing him on home confinement.  *See id.* at 1–2.

Kealoha, however, has not demonstrated that the requisite "extraordinary and compelling" circumstances exist because, despite his claimed health conditions, including obesity, there are no positive COVID-19 cases among the inmate population at the facility where Kealoha is housed.  And even if that were not the case, the Court cannot grant Kealoha the relief he seeks because he poses "a danger

---

[1] *See* Letter, *United States v. Solomon Kealoha*, No. 1:17-cr-555-DKW-4 (D. Haw. May 11, 2020), Dkt. No. 472; Letter, *United States v. Solomon Martin*, No. 1:4-cr-265-DKW-1 (D. Haw. May 11, 2020), Dkt. No. 70.  Unless otherwise noted, docket entry citations in this Order refer to the record in Case No. 17-cr-555-DKW-4.

to the safety of . . . the community" and the sentencing factors do not militate in his favor.[2]  Accordingly, Kealoha's motion is DENIED.

## FACTUAL & PROCEDURAL BACKGROUND

### A.  Relevant Factual Background

On October 19, 2004, Kealoha pled guilty to conspiracy to distribute, and possession with the intent to distribute, 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a), 846.  Dkt. No. 369, ¶ 47.[3]  On August 1, 2005, Kealoha was held accountable for 9 pounds of methamphetamine and sentenced to 120 months' imprisonment and 5 years' supervised release.  Dkt. No. 369 at 17.[4]  On June 30, 2013, after roughly 7 years and 11 months in prison, Kealoha began his 5-year term of supervised release.  Dkt. No. 369 at 17.

In June 2016—while on supervised release—Kealoha was arrested for, and then later charged with, conspiracy to distribute, and possession with the intent to distribute, 50 grams or more of methamphetamine and 500 grams or more of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B).  *Id.* at ¶¶ 1–2, 5, 49.  On April 3, 2018, Kealoha pled guilty to that charged offense.  Dkt. No. 164; Dkt. No. 369, ¶¶ 1–4.  Kealoha was ultimately held responsible for 74.2 grams of "ice" (high-purity methamphetamine) and 19 pounds (8,618.4 grams) of

---

[2]*See* 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13 cmt. n.1.
[3]*See Solomon Martin*, No. 1:4-cr-265-DKW-1 (D. Haw. Oct. 19, 2004), Dkt. No. 34, 45.
[4]*See Solomon Martin*, No. 1:4-cr-265-DKW-1 (D. Haw. Aug. 1, 2005), Dkt. Nos. 44, 45.

generic methamphetamine, resulting in a total converted drug weight of 18,720.8 kilograms.  Dkt. No. 369 at 10–11, 33; *cf.* U.S.S.G. § 2D1.1 cmt. n.8.  After the Government sought an enhanced sentence pursuant to 21 U.S.C. § 851 based upon Kealoha's conviction in Case No. 1:4-cr-265-DKW-1, Dkt. No. 369, ¶¶ 3, 80, Kealoha's offense carried a minimum term of 15 years' imprisonment and at least 10 years' supervised release, with a maximum term of life in prison.  *Id.* at ¶¶ 81, 84. The offense level and Kealoha's extensive criminal history, combined with the Government's request for a downward departure due to the substantial assistance Kealoha provided, yielded a recommended Guidelines range of 110 to 137 months' imprisonment.  *Id.* at ¶¶ 85a, 97a; *see id.* at 34–35.  The Guidelines recommended that this sentence "be imposed consecutively to the sentence imposed for the revocation" of Kealoha's supervised release in Case No. 1:4-cr-265-DKW-1.  *See* U.S.S.G. § 5G1.3 cmt. n.4(C); Dkt. No. 369 at 35.

On August 29, 2019, this Court sentenced Kealoha to 126 months' imprisonment in Case No. 1:17-cr-555-DKW-4, and 12 months' imprisonment for the violation and revocation of Kealoha's supervised release in Case No. 1:4-cr-265-DKW-1.  *See* Dkt. Nos. 373, 377, 378.[5]  This Court ordered that the two sentences run concurrently.  *Id.*

---

[5] *See Solomon Martin*, No. 1:4-cr-265-DKW-1 (D. Haw. Aug. 1, 2005), Dkt. No. 67, 69.

In imposing this sentence, the Court adopted the presentence investigation report (PSR) in full, Dkt. No. 378 at 1, which indicates Kealoha is 5 feet 11 inches tall and weighs 604 pounds (Body Mass Index of 84.2), and has the following health conditions, all of which are due to his obesity: back pain; poor circulation in his extremities; difficulty sleeping; high blood pressure (hypertension); and "borderline diabetes." Dkt. No. 369, ¶¶ 66–67. The PSR also notes that Kealoha has no history of mental or emotional problems. *Id.* at ¶ 68.

Kealoha is currently 41 years of age and incarcerated at Big Spring FCI,[6] a low-security federal prison located in Howard County, Texas.[7] Having served approximately 27 months of his 126-month sentence, Kealoha is scheduled to be released on March 14, 2027.[8]

## LEGAL STANDARD

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (alterations in original) (quoting 18 U.S.C. § 3582(b)). Such circumstances must be "expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal

---

[6]*Find an Inmate*, BOP, https://www.bop.gov/inmateloc/ (last visited July 1, 2020).

[7]*FCI Big Spring*, BOP, https://www.bop.gov/locations/institutions/big/ (last visited July 1, 2020).

[8]*Supra* n.6. Kealoha has been incarcerated from the time he voluntarily surrendered at his guilty plea hearing on April 3, 2018. Dkt. No. 164; Dkt. No. 369 at 2, 36.

Procedure." *See* 18 U.S.C. § 3583(c)(1)(B); *see also Dillon*, 560 U.S. at 827, 831; *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003). Congress carved out such an exception in 18 U.S.C. Section 3582(c)(1), as amended by the First Step Act of 2018 (FSA), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018).[9] Under Section 3582(c)(1), courts may "modify a term of imprisonment" where, as here, the inmate files a motion, if three requirements are satisfied:

> (1) the inmate "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion" on behalf of the inmate "or the lapse of 30 days from the receipt of such a request" by the relevant warden;
>
> (2) the inmate has established that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and
>
> (3) the court has "consider[ed] the factors set forth in [18 U.S.C. Section] 3553(a)" and found that the inmate is "not a danger to the safety of any other person or the community, as provided under [18 U.S.C. Section] 3142(g)."

*See* 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13 (policy statement). The inmate bears the burden of establishing the requirements for a sentence reduction by a preponderance of the evidence. *See, e.g.*, *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998); *see also United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *Walton v.*

---

[9]The FSA amended the *procedural requirements* under Section 3582(c)(1)(A) to permit inmates to directly petition courts for a sentence reduction, whereas pre-amendment, an inmate could only petition the BOP Director, who then had the discretion to move the court to reduce the inmate's sentence based upon "extraordinary and compelling reasons." *See* FSA § 603(b), 132 Stat. at 5239; U.S.S.G. § 1B1.13 cmt. n.4.; *see also United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).

*Ariz.*, 497 U.S. 639, 650 (1990) (holding that a defendant's due process rights "are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency."), *overruled on other grounds by Ring v. Ariz.*, 536 U.S. 584, 609 (2002).

## DISCUSSION

Kealoha seeks a sentence reduction or, in the alternative, to be placed on home confinement on the grounds that his "underlying health issues put [him] at risk for a bad outcome if [he] contract[s] COVID-19." Dkt. No. 479 at 8–9. The Government defends, almost solely, on the basis that Kealoha has not satisfied the administrative exhaustion requirement. *See* Dkt. No. 475 at 1–5, 14–15. For the reasons that follow, Kealoha has satisfied the exhaustion requirement because 30 days have passed since the Warden at Big Spring FCI apparently received Kealoha's request for compassionate release, and the Warden has not yet issued a response. But because Kealoha has not carried his burden on the second and third requirements set forth in Section 3582(c), as outlined above, a reduction in Kealoha's sentence is not warranted.

## I.    Exhaustion

The Government contends Kealoha has not satisfied the "mandatory" exhaustion requirement under Section 3582(c)(1)(A), and his motion should be dismissed. *See* Dkt. No. 475 at 1–3, 14. Because Kealoha avers that he submitted a

request and the statutory 30-day response period passed with no response from the Warden at Big Spring FCI, Dkt. No. 479 at 3, Kealoha has exhausted his administrative relief in accordance with Section 3582(c)(1)(A).

### A.    Exhaustion is Mandatory Under Section 3582(c)(1)

Section 3582(c)(1)(A) provides, in relevant part, that a "court may not modify a term of imprisonment once it has been imposed" except:

> [U]pon motion of the defendant *after* the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such request by the warden . . ., whichever is earlier, [a court] may reduce the term of imprisonment . . .

*See* 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That *statutory* language establishes a "mandatory" exhaustion requirement, similar to that in 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act (PLRA),[10] and "suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.'" *See, e.g.*, *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016) (holding that "mandatory exhaustion statutes like [Section 1997e(a) of] the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion" because unlike "judge-made

---

[10]42 U.S.C. Section 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

exhaustion doctrines . . . amendable to judge-made exceptions," a "statutory exhaustion provision stands on a different footing" in that "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to"); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required."), *superseded by statute on other grounds as stated in Booth*, 532 U.S. at 740–41. The coronavirus pandemic does not exempt inmates from the exhaustion requirement.[11] Therefore, although the FSA allows an inmate to directly petition a court for compassionate release, Section 3582(c)(1)(A) mandates that an inmate exhaust administrative relief before a court "may reduce the term of imprisonment."

---

[11] *See, e.g.*, *United States v. Drummondo-Farias*, No. CR 12-00174(1) JMS, 2020 WL 2616119, at *2–4 & n.6 (D. Haw. May 19, 2020) (Seabright, J.) (concluding further that it is irrelevant whether exhaustion under Section 3582(c)(1)(A) is "jurisdictional," meaning it cannot be waived, or merely a "claims-processing rule" that the Government may waive, because so long as the government has raised the issue, "it remains a mandatory *statutory* requirement"); *United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *5–10 (D. Or. Apr. 6, 2020) (providing a lengthy discussion of the jurisdictional issue and cases decided in various jurisdictions); *United States v. Allison*, No. CR16-5207RBL, 2020 WL 1904047, at *1 (W.D. Wash. Apr. 17, 2020) (collecting cases); *United States v. Weidenhamer*, No. CR1601072001PHXROS, 2019 WL 6050264, at *2 (D. Ariz. Nov. 8, 2019); *United States v. Reid*, No. 17-CR-00175-CRB-1, 2020 WL 1904598, at *3 (N.D. Cal. Apr. 18, 2020); *United States v. Johnson*, No. 2:15-CR-00003-KJM, 2020 WL 2307306, at *3 (E.D. Cal. May 8, 2020); *United States v. Eberhart*, No. 13-CR-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020).

## B.    Section 3582(c)(1)(A) Exhaustion Requirements

Under Section 3582(c)(1)(A), the first step in the exhaustion process for any inmate is to submit a compassionate release request to the warden.  *See also* 28 C.F.R. § 571.61(a) ("A request for a motion under [Section] 3582(c)(1)(A) shall be submitted to the Warden."); 28 C.F.R. §§ 571.60–.64 ("Compassionate Release Procedures for the Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)"). There are then two ways in which an inmate may satisfy the statutory exhaustion requirement.  *First*, if at least 30 days have "lapse[d]" since the inmate submitted his request to the warden and the BOP has failed to respond, then the inmate may file a motion in federal court and the court "may reduce the term of imprisonment."  18 U.S.C. § 3582(c)(1)(A).  This allows the warden a reasonable time to respond to the inmate's request, but it also prevents the warden from denying the inmate relief by simply refusing to respond.  *Second*, if the *warden* denies the request within the 30-day period, the inmate must "fully exhaust[] all administrative rights to appeal."  18 U.S.C. § 3582(c)(1)(A); *see, e.g.*, *United States v. Miller*, No. 2:16-CR-00269-BLW, 2020 WL 113349, at *2 (D. Idaho Jan. 8, 2020) (noting that Congress did not intend to allow a defendant to "short-circuit the [BOP]'s administrative procedures" by simply "waiting 30 days after filing his request, despite the warden timely acting on that request").[12]  To that end, the inmate must "appeal the denial through the

---

[12]Requiring an inmate to pursue the BOP's appeal process fulfills the two important objectives of

Administrative Remedy Procedure (28 CFR part 542, subpart B)."   28 C.F.R. § 571.63(a); 28 C.F.R. § 542.15(a) (establishing two levels of appeal after the warden: first to the Regional Director and then to the BOP General Counsel).[13]  Thus, where the "BOP has not had thirty days to consider [the inmate]'s request to move for compassionate release," or within that time period the BOP has issued an adverse decision for the inmate to administratively appeal, the inmate's motion must be dismissed.  *See, e.g.*, *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).[14]

Here, Kealoha has satisfied the first option for administrative exhaustion under Section 3582(c)(1)(A).  Kealoha avers that on April 6, 2020, he submitted a request to the warden, "asking for compassionate release due to COVID-19 and all [his] health issues."  Dkt. No. 479 at 4.  As of June 17, 2020, Kealoha further asserts that he has not received a response.  *Id.* at 3–4.  Assuming these facts are true,[15] more

---

administrative exhaustion: (1) "protecting administrative agency authority," especially in matters involving "the agency's discretionary power or . . . its special expertise"; and (2) "promoting judicial efficiency" by affording the agency an "opportunity" to decide the issue, whereby the controversy "may well be mooted," or at the very least, the exhaustion process will "produce a useful record for subsequent judicial consideration."  *See McCarthy*, 503 U.S. at 145.

[13] If an inmate's request is denied "by the General Counsel or Director, Bureau of Prisons," this "constitutes a final administrative decision" and the "inmate may not appeal the denial through the Administrative Remedy Procedure."  28 C.F.R. § 571.63(d).

[14] *See also Miller*, No. 2:16-CR-00269-BLW, 2020 WL 113349, at *2; *United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *10 (D. Or. Apr. 6, 2020); *United States v. Reid*, No. 17-CR-00175-CRB-1, 2020 WL 1904598, at *4 (N.D. Cal. Apr. 18, 2020); *Weidenhamer*, 2019 WL 6050264, at *4.

[15] Although the Government asserts in its response brief that the BOP "has no record of [Kealoha] making any such request," Dkt. No. 474 at 7, for purposes of this motion, the Court accepts Kealoha's representation that he submitted a request for compassionate release to the Warden of Big Spring FCI on April 6, 2020.  As Judge Seabright observed, "it would be difficult for [an inmate] to prove at this stage that the Warden actually received his request."

than thirty days have passed with no response from the Warden at Big Spring FCI.

Accordingly, Kealoha has exhausted his administrative remedies, as required by

Section 3582(c)(1)(A).[16]

## II.    Extraordinary and Compelling Reasons

Section 3582(c)(1) permits a sentence reduction only upon a showing of

"extraordinary and compelling reasons," and only if "such a reduction is consistent

with applicable policy statements issued by the Sentencing Commission" (the

"Commission").   Although Kealoha suffers from a condition that puts him at a high

risk of becoming seriously ill from COVID-19 (severe obesity), he has not shown

that there is a high risk he *will* become infected; nor has he shown that, if he did

become infected, his ability "to provide self-care within the . . . correctional facility"

would be "substantially diminishe[d]" such that he would "not [be] expected to

recover."  *See* U.S.S.G. § 1B1.13 cmt. n.1(A).

### A.    The Commission's Commentary in U.S.S.G. § 1B1.13 Defining "Extraordinary and Compelling" is Binding on Federal Courts

Congress did not delineate the bounds for what constitutes "extraordinary and

compelling," except to state that "[r]ehabilitation of the defendant alone" is not

---

*Drummondo-Farias*, 2020 WL 2616119, at *4.  This is particularly true for *pro se* inmates who
allege they submitted a request, like Kealoha, because it is unlikely they have the wherewithal or
perhaps ability to make a copy before submitting the request.

[16]*See, e.g.*, *Drummondo-Farias*, 2020 WL 2616119, at *4 (Seabright, J.); *United States v. Hinz*,
No. 2:12-CR-00294-TLN, 2020 WL 2319924, at *1 (E.D. Cal. May 11, 2020); *United States v.
Singui*, No. 212CR00851CAS1, 2020 WL 2523114, at *3 (C.D. Cal. May 18, 2020); *Johnson*,
2020 WL 2307306, at *4.

enough.    28 U.S.C. § 994(t).    Instead, Congress directed the Commission to
promulgate policy statements "describ[ing] what should be considered extraordinary
and compelling reasons for sentence reduction, including the criteria to be applied
and a list of specific examples." *Id.* The Commission did just that under Application
Note 1 to U.S.S.G. § 1B1.13, albeit prior to the enactment of the FSA.    The
Commission outlined the following four categories of circumstances that may
constitute "extraordinary and compelling reasons" for a sentence reduction:

> (A) the inmate is "suffering from a terminal illness," or a "serious" physical
> or cognitive condition "that substantially diminishes" the inmate's ability "to
> provide self-care within the environment of a correctional facility and from
> which he or she is not expected to recover";
>
> (B) the defendant is at least 65 years old, is "experiencing a serious
> deterioration in physical or mental health because of the aging process," *and*
> "has served at least 10 years or 75 percent of his or her term of imprisonment,
> whichever is less";
>
> (C) family circumstances involving "the death or incapacitation of the
> caregiver of the defendant's minor child," or the "incapacitation of the
> defendant's spouse or registered partner," leaving the inmate as "the only
> available caregiver for the spouse or registered partner"; or
>
> (D) "[a]s determined by the Director of the [BOP]," in the inmate's case there
> is "an extraordinary and compelling reason other than, or in combination
> with," the other three reasons described.

*See* U.S.S.G. § 1B1.13 cmt. n.1.

Several district courts have concluded that because the policy statement is
"outdated" and does not account for the fact that an inmate may now seek relief

- 12 -

directly from the court,[17] the definition of "extraordinary and compelling" is no longer limited to the examples set forth in the Commission's policy statement above, and courts are free to independently make that determination.[18]  This Court, however, has declined to subscribe to that rationale.  *See United States v. Lum*, No. 18-CR-00073, 2020 WL 3472908, at \*3 (D. Haw. June 25, 2020); *United States v. Kazanowski*, No. 15-CR-00459, 2020 WL 3578310, at \*6 (D. Haw. July 1, 2020).

Courts are not at liberty to treat the Commission's commentary as merely "persuasive," "of only limited authority," or "not binding on the federal courts." *Stinson v. United States*, 508 U.S. 36, 39, 44–47 (1993) (citation omitted).   In *Stinson*, the Supreme Court announced "the standard that governs the decision whether particular interpretive or explanatory commentary is binding."  *Id.* at 43. There, the Court explained:

> The Sentencing Commission promulgates the guidelines by virtue of an express congressional delegation of authority for rulemaking, and through the informal rulemaking procedures. Thus, the guidelines are the equivalent of legislative rules adopted by federal agencies.  The functional purpose of commentary (of the kind at issue here) is to assist in the interpretation and application of those rules, which are within the Commission's particular area of concern and expertise and which the Commission itself has the first responsibility to formulate and announce. In these respects this type of commentary is akin to an agency's interpretation of its own legislative rules. As we have often

---

[17]The Commission "has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners."  *See, e.g.*, *Brown*, 411 F. Supp. 3d at 449 (citations omitted)).

[18]*See, e.g.*, *Rodriguez*, 424 F. Supp. 3d at 681 (collecting cases); *Singui*, 2020 WL 2523114, at \*4 (C.D. Cal. May 18, 2020) (collecting cases).

stated, provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation."

*Stinson*, 508 U.S. at 44–45 (internal citations omitted) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).   Thus, the Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Id.* at 38.[19]

Here, the FSA only amended the *procedural requirements* under Section 3582(c)(1).  *See supra* n.9.  An inmate may now personally petition a court under Section 3582(c)(1).  The mere fact that the Commission has not accounted for this change in U.S.S.G. § 1B1.13 simply means a court must nevertheless entertain a motion from an inmate.  But this does not nullify the Commission's entire policy statement or the commentary defining "extraordinary and compelling," nor does it somehow render that guidance "outdated."  *See* 18 U.S.C. § 3553(a)(5) (any "pertinent policy statement" is to be considered "subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments

---

[19]Although *Stinson* was decided before *United States v. Booker*, 543 U.S. 220, 246 (2005), in which the Supreme Court held that the Guidelines are advisory, not mandatory, the Supreme Court later held in *Dillon* that *Booker* is inapplicable in sentence-modification proceedings under 18 U.S.C. § 3582(c)(2) because such proceedings are fundamentally different, *see Dillon v. United States*, 560 U.S. 817, 828–30 (2010), and, as such, the relevant Guidelines policy statement "constrained" courts.  *See id.* at 825–27.  The same rationale applies to Section 3582(c)(1), the companion statutory provision to the one addressed in *Dillon*.

- 14 -

have yet to be incorporated by the Sentencing Commission into the amendments issued under section 994(p) of title 28.").  Indeed, Congress did not alter the meaning of "extraordinary and compelling" in the statute, nor did it revoke the Commission's authority to define that phrase.  *See Mistretta v. United States*, 488 U.S. 361, 393–94 (1989) (Congress may "revoke or amend any or all of the Guidelines" by statute "at any time").

Therefore, because Application Note 1 to U.S.S.G. § 1B1.13 does not run afoul of the Constitution or a federal statute, and is not "plainly erroneous or inconsistent" with Section 1B1.13, the Commission's "commentary is a binding interpretation of the phrase '[extraordinary and compelling].'"  *Stinson*, 508 U.S. at 47; *see also Dillon*, 560 U.S. at 824 (explaining that a district court's discretion to modify a sentence under Section 3582(c)(2) is "constrained by the Commission's statements").[20]  In so holding, the Court joins the numerous district courts that, for various reasons, "continue to follow the guidance of the Sentencing Commission's

---

[20]Numerous courts have appropriately turned to *Stinson* and reached the same conclusion.  *See, e.g.*, *United States v. Garcia*, No. 4:05-CR-40098, 2020 WL 2039227, at *3–5 (C.D. Ill. Apr. 28, 2020); *United States v. Sandoval*, No. CR14-5105RBL, 2020 WL 3077152, at *3–4 (W.D. Wash. June 10, 2020) (citing nine other decisions); *United States v. Rollins*, No. 99 CR 771-1, 2020 WL 3077593, at *1–2 (N.D. Ill. June 10, 2020) (explaining further that Application Note 1(D) to U.S.S.G. § 1B1.13 is not inconsistent with § 3582(c)(1)(A)(i) because it may still be "applie[d] with full force if the *Director* invokes it in moving for a sentence reduction" and the "fact that Note 1(D) is unavailable if the *defendant* moves for a sentence reduction does not render it inconsistent with § 3582(c)(1)(A)(i); rather, Note 1(D) is simply inoperative in that circumstance").

policy statement limiting the scope of 'extraordinary and compelling reasons' that warrant compassionate release under § 3582(c)(1)."[21]

## B.     Analysis: Extraordinary and Compelling Reasons

Kealoha argues his circumstances rise to the level of "extraordinary and compelling" because he is at a "far greater risk of death if [he] contracts [the] COVID-19 virus" due to his hypertension, morbid obesity, and sleep apnea.  *See* Dkt. No. 472 at 2–3; Dkt. No. 479 at 8.   In that regard, the only relevant "extraordinary and compelling" scenario identified by the Commission is subpart (A) of the Commission's application note.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A).[22] Kealoha, however, has not carried his burden under that provision.

Although the Court acknowledges that there is a heightened risk for the virus to spread in correctional facility environments,[23] standing alone, these concerns about possible exposure to COVID-19 in the abstract are not enough to warrant an inmate's early release.  *See, e.g.*, *Raia*, 954 F.3d at 597; *Riley*, 2020 WL 1819838,

---

[21]*See, e.g.*, *Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838, at *8 (W.D. Wash. Apr. 10, 2020); *Eberhart*, 2020 WL 1450745, at *2; *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *2 (E.D. Wash. March 31, 2020); *United States v. Gross*, No. 2:04-CR-032-RMP, 2019 WL 3538967, at *2 (E.D. Wash. Aug. 2, 2019); *United States v. Shields*, No. 12-CR-00410-BLF-1, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019).
[22]Kealoha does not contend that the Director of the BOP has determined that there exists in this case some "other" extraordinary or compelling reason for a reduction in sentence.  *See* U.S.S.G. § 1B1.13 cmt. n.1(D).
[23]*See generally Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited July 1, 2020).

at *7 (collecting cases).  That type of general concern is shared by the public at large, as well as all incarcerated individuals.

Rather, to establish "extraordinary and compelling reasons" stemming from the current coronavirus pandemic, and for such a finding to be consistent with Application Note 1 to U.S.S.G § 1B1.13, an inmate must necessarily establish the following three elements by a preponderance of the evidence: (1) the inmate is "suffering from a terminal illness," or a "serious" physical or cognitive condition; (2) that condition puts the inmate at a high risk of becoming seriously ill from COVID-19; and (3) if the inmate were to contract COVID-19, the inmate's ability "to provide self-care within the . . . correctional facility" would be "substantially diminishe[d]" and the inmate would "not [be] expected to recover."  *See* U.S.S.G. § 1B1.13 cmt. n.1(A).  Kealoha's motion falters on the last prong.

First, according to the CDC, Kealoha's morbid obesity (BMI of 84.2), Dkt. No. 369, ¶¶ 66–67, does put him at a high risk of becoming seriously ill if he contracts the virus.  As of June 25, 2020, the CDC has stated that individuals at an "increased risk of severe illness from COVID-19" include people "aged 65 years and older,"[24] as well people of all ages with the following underlying health

---

[24] *See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk for Severe Illness – Older Adults*, CDC (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited July 6, 2020). The CDC states in broad terms that "[a]s you get older, your risk for severe illness from COVID-19 increases," *i.e.*, "people in their 50s are at higher risk for severe illness than people in their 40s," "people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s," and that the "greatest

conditions: (i) "Chronic kidney disease"; (ii) "COPD (chronic obstructive pulmonary disease)"; (iii) "Immunocompromised state (weakened immune system) from solid organ transplant"; (iv) "Obesity (body mass index [BMI] of 30 or higher)"; (v) "Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies"; (vi) "Sickle cell disease"; and (vii) "Type 2 diabetes mellitus."[25]   However, Kealoha's age and his other health conditions (*i.e.*, sleep apnea, hypertension, and "borderline diabetes"), do not put him at an "increased risk of severe illness from COVID-19" because these conditions are not included in the above list provided by the CDC.  Not every physical or cognitive condition can be a risk factor if "extraordinary and compelling" is to have any meaning.  Moreover, various health conditions—none of which independently qualify as a CDC risk factor—cannot somehow be combined to suddenly render an individual at high-risk.

---

risk for severe illness from COVID-19 is among those aged 85 or older."  Because the CDC also notes that "8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older," *id.*, for purposes of this motion, the Court will consider age 65 as the threshold for determining whether extraordinary and compelling circumstances exist, insofar as age is concerned, to warrant a sentence reduction.

[25] *See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk for Severe Illness – People of Any Age with Underlying Medical Conditions*, CDC (June 25, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 6, 2020).  The CDC also notes that people with the following conditions "*might* be at an increased risk for severe illness from COVID-19": Asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis (having damaged or scarred lung tissues); smoking; thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.  *Id.* (emphasis added).

Second, in order for Kealoha's obesity (or any of his conditions) to matter, insofar as an "extraordinary and compelling" finding is concerned, Kealoha must (at the very least) show that there is a high risk of contracting the virus because there are positive COVID-19 cases at the facility where he is housed. Kealoha has not done so.

Here, the risk of Kealoha contracting COVID-19 at Big Spring FCI is, at best, speculative. While Kealoha describes how the virus has affected other BOP facilities, Dkt. No. 472 at 1; Dkt. No. 479 at 1, this high level of generality says nothing about the state of affairs at Big Spring FCI, where Kealoha is housed. Big Spring FCI currently houses a total of 1,072 inmates (*i.e.*, 929 inmates at the FCI and 143 at the Camp).[26] As of the date of this Order, the BOP's coronavirus-related data for Big Spring FCI indicates there are: 0 inmates positive; 6 staff positive; 0 inmate deaths; and 0 staff deaths.[27] In other words, the number of positive cases at Big Spring FCI is approximately 0.5% of the inmate population. Big Spring FCI, therefore, is statistically faring better than many cities and counties in Texas.[28] As

---

[26]*FCI Big Spring*, BOP, https://www.bop.gov/locations/institutions/big/ (last visited July 6, 2020).

[27]*See COVID-19 Coronavirus: COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited July 6, 2020). On this public website containing the coronavirus-related data for BOP facilities, the BOP notes that it "will update the open COVID-19 confirmed positive test numbers, recoveries, and the number of COVID-19 related deaths daily at 3:00 p.m.," and because the BOP "has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting," the data is expected to reflect an increase in the number of COVID-19 positive tests. *Id.*

[28]*See Cases by County*, CDC (June 17, 2020), https://www.cdc.gov/coronavirus/2019-

such, it appears those personnel at Big Spring FCI with the unenviable task of simultaneously maintaining order and preventing the spread of the virus have thus far been successful in their efforts.  With no reported cases among the inmate population—five months into the pandemic—Kealoha's speculation about the possibility of contracting the virus is hardly enough to justify his immediate release.

Lastly, even if a large portion of the Big Spring FCI inmate population were infected with COVID-19, Kealoha has not shown that, should *he* contract the virus, Big Spring FCI is any less equipped to treat him than if he were not incarcerated.  Kealoha says little, other than repeat his generalized fear of COVID-19 in the barracks-like setting in which he lives at FCI Big Spring.  Dkt. No. 479 at 2, 8.  To the contrary, in collaboration with the CDC and the World Health Organization (WHO), the BOP has taken extensive efforts to curtail the spread of the virus; including, *inter alia*, suspending social visits; suspending inmate transfers; testing inmates who arrive at a BOP facility; suspending legal visits (with some exceptions); implementing enhanced health screening of staff; quarantining symptomatic inmates; suspending tours; limiting inmates "in their movements to prevent congregate gathering and maximize social distancing"; and completing an inventory of personal protective equipment at all BOP locations with the BOP continuing to

---

ncov/cases-updates/county-map.html (last visited July 6, 2020) (noting cases per 100,000 residents and total deaths).

"stockpile."[29]  As such, the BOP's preventive measures are as extensive, if not more, than those implemented in cities and states.  And nothing in the record establishes that Kealoha is not being properly cared for at Big Spring FCI.  Conditions that can be managed in prison are not a basis for compassionate release.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A).

Accordingly, Kealoha has not carried his burden of showing that there are "extraordinary and compelling reasons" to justify his early release under 18 U.S.C. § 3582(c)(1).

## III.   Section 3553(a) Factors & Risk of Danger to the Community

Even if extraordinary and compelling reasons supported compassionate release, the Court is not convinced the applicable factors in 18 U.S.C. § 3553(a) weigh in favor of reducing Kealoha's sentence or authorizing home confinement. *See* 18 U.S.C. § 3852(c)(1)(A).  Dkt. No. 472 at 1; Dkt. No. 479 at 8.

Upon review of the relevant factors in Section 3553(a), Kealoha's 126-month sentence is, as it was at sentencing, "sufficient, but not greater than necessary, . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal

---

[29]*See generally BOP Implementing Modified Operations*, BOP, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 30, 2020); *A BOP COVID-19 Overview*, BOP, https://www.bop.gov/coronavirus/overview.jsp#bop_emergency_response (last visited July 1, 2020).

conduct; [and] (C) to protect the public." *See* 18 U.S.C. § 3553(a)(2).   This conclusion is borne out when considering "the nature and circumstances" of Kealoha's offenses and his "history and characteristics." *Id.* § 3553(a)(1).

After serving nearly 8 years in prison for conspiracy and possession with intent to distribute methamphetamine, Kealoha was on supervised release when he again became involved in an enterprise that distributed substantial quantities of methamphetamine. Dkt. No. 369, ¶¶ 1–2, 5, 8–18, 49. Having apparently learned little from his prior experience, Kealoha was fortunate in that he could very well have been sentenced to the statutory minimum of 15 years' imprisonment (180 months) for distributing roughly 19 pounds (8,618.4 grams) of methamphetamine. *Id.* at 10–11, 24, 31; 21 U.S.C. §§ 841(a)(1), 851.   Instead, the Court sentenced Kealoha to 126 months' imprisonment in Case No. CR17-00555 DKW and 12 months' imprisonment for violating the terms of his supervised release in Case No. CR04-00265 DKW. *See* Dkt. Nos. 373, 377, 378. The Court could have also set these two sentences to run consecutively, *see* U.S.S.G. § 5G1.3 cmt. n.4(C), but elected not to. Moreover, the Court was already aware of, and accounted for, the same health concerns Kealoha now raises. Dkt. No. 369 at 21. The only new circumstances cited in Kealoha's motion (concerns about the coronavirus pandemic) do not justify a further reduction in his sentence. Kealoha has served approximately 27 months of his 126-month sentence, having been incarcerated during the pre-trial

phase since April 3, 2018. Dkt. No. 164. Releasing him now would undoubtedly result in an "unwarranted sentence disparit[y] among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). Thus, as the Court found on August 29, 2019, when sentencing Kealoha, the Court concludes today that 126 months' imprisonment is sufficient but not greater than necessary to achieve the statutory purposes of sentencing.

In the end, the lynchpin here is that Kealoha is not entitled to early release because he poses a "danger to the safety of . . . the community."[30] Kealoha's conviction involved a "controlled substance"; the "weight of the evidence" against Kealoha was undeniable; he committed the offense while on supervised release in a case in which he also distributed methamphetamine; and he has a history of substance abuse. *See* 18 U.S.C. § 3142(g)(1)–(3). To the extent Kealoha has "family ties," *see id.*; Dkt. No. 472 at 3; Dkt. No. 369, ¶¶ 60–65, this does not offset the countervailing fact that Kealoha's record is replete with violent behavior involving firearms and drugs. *See* Dkt. No. 369 at 12–19, 33–34. Aside from flooding the community with copious amounts of narcotics, a sampling of Kealoha's criminal history reveals: criminal property damage when he attacked the occupants of a vehicle, shattering the vehicle's glass in order to access his victims; disorderly conduct for a street fight where he was subdued by police with pepper spray after he

---

[30]*See* 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13.

failed to heed their commands; assault, reckless, endangerment, and terroristic threatening when he discharged a firearm in public and then used his vehicle to ram a police patrol vehicle in order to avoid law enforcement pursuit; and fighting and "threatening bodily harm" as disciplinary infractions in prison during prior incarcerations. *See id.* Given the foregoing, the Court finds it inevitable that if released and left to his own devices, Kealoha will endanger the community in one way or another. Accordingly, Kealoha's request for a sentence reduction is DENIED.[31]

To the extent Kealoha requests that the Court place him on home confinement for the remainder of his sentence, Dkt. No. 472 at 1; Dkt. No. 479 at 8, the Court lacks the authority to do so. By its terms, Section 3583(c)(1)(A) only permits a court to "reduce the term of imprisonment." "The [BOP] has the statutory authority to choose the locations where prisoners serve their sentence." *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (citing 18 U.S.C. § 3621(b) ("The [BOP]

---

[31]*See, e.g.*, *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *1, *3–4 (D. Idaho Apr. 7, 2020) (denying compassionate release to 70-year-old inmate who was blind in one eye, suffering from atrial fibrillation and stage 4 kidney disease, and had served 146 months of his 240-month sentence (previously reduced from 264 months) for distributing methamphetamine near a school and unlawful possession of a firearm because, if released, he would "pose a danger to the community"); *Singui*, 2020 WL 2523114, at *4–5 (denying diabetic inmate's coronavirus-based early release motion because there were "no current reported infections" at the inmate's facility and he "still pose[d] a danger to the community."); *United States v. Hembry*, No. 12-CR-00119-SI-1, 2020 WL 1821930, at *2 (N.D. Cal. Apr. 10, 2020) (denying motion for compassionate release to inmate with diabetes based on COVID-19 risks because the inmate was "housed at a facility with no reported infections" and he still "pose[d] a danger to the community").

shall designate the place of the prisoner's imprisonment.")); 18 U.S.C. § 3624(c)(2) (establishing the BOP's authority to place an inmate in "home confinement"). Moreover, on March, 26, 2020, U.S. Attorney General William Barr directed the BOP Director to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[32]  The following day, Congress granted the BOP Director the authority to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under . . . [18 U.S.C. Section] 3624(c)(2)]," so long as "the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau."  *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 515–17 (2020).  In response, "the BOP began immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates are suitable for home confinement.  Since the release of the Attorney General's original memo to the Bureau of Prisons . . . instructing [the BOP] to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 4,600 inmates on home confinement; an increase

---

[32]Memorandum from Attorney Gen. to Director of Bureau of Prisons, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.justice.gov/file/1262731/download.

of 161 percent."[33]    Of course, a sentencing court may make a "non-binding" recommendation to the BOP regarding where an inmate's sentence should be served. *Ceballos*, 671 F.3d at 855 (citing 18 U.S.C. § 3621(b)).    As a discretionary matter, however, the Court declines to make a recommendation to the BOP concerning home confinement, particularly given the danger Kealoha poses to the community; his ambiguous plan upon release, Dkt. No. 472 at 3; and that the BOP is swiftly fulfilling its statutory role during the coronavirus pandemic.

## CONCLUSION

For the reasons set forth herein, Kealoha's motion for compassionate release, (Dkt. No. 472 in Case No. CR17-00555 DKW; and Dkt. No. 70 in Case No. CR04-00265 DKW), is DENIED.

IT IS SO ORDERED.

DATED: July 6, 2020 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

*United States of America vs. Solomon Kealoha, a.k.a., Solomon Martin*; CR No. 17-00555 DKW and CR 04-00265 DKW; **ORDER DENYING DEFENDANT'S MOTION FOR A SENTENCE REDUCTION**

---

[33]*COVID-19 Coronavirus: COVID-19 Home Confinement Information*, BOP, https://www.bop.gov/coronavirus/ (last visited July 6, 2020).